## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT HONECK, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:04cv1577 (JBA) |
| | : | |
| NICOLOCK PAVING STONES OF | : | |
| NEW ENGLAND, LLC, | : | |
|     Defendant | : | |

### SUBSTITUTED RULING ON DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT [DOC. # 39]

Plaintiff Robert Honeck filed a four-count complaint against his employer, Nicolock Paving Stones of New England, LLC ("Nicolock New England"). See Am. Compl. [Doc. # 12]. Plaintiff's common-law claims for wrongful discharge and intentional infliction of emotional distress were dismissed. See Ruling on Def.'s Mot. to Dismiss [Doc. # 31] at 1.  Currently before the Court is defendant's motion for summary judgment on plaintiff's two remaining claims alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. See Mot. Summ. J. [Doc. # 39].  Oral argument was held July 24, 2006.  For the reasons that follow, defendant's motion will be granted.

## I. FACTUAL BACKGROUND

On March 3, 1997, at the age of 54, plaintiff was hired by Nicolock Paving Stones of Long Island, LLC ("Nicolock") as a sales representative. Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 48] at ¶

2.  Nearly six years later, on January 9, 2003, eight days short
of his sixtieth birthday, plaintiff was asked to tender his
resignation. Id. at ¶ 130.

Nicolock manufactures interlocking paving stones and
retaining wall systems, which it sells to dealers. Id. at ¶ 3.
Roberto Nicolia is the owner and manager of Nicolock, of which
Nicolock New England is a subsidiary. Id. at ¶ 10.  Nicolia was
35 years old when plaintiff was hired and 41 years old when
plaintiff was asked to resign. Id. at ¶ 132.  Vito Picone, who is
four years older than plaintiff, is Vice President of Operations
for Nicolock. Id. at ¶¶ 8, 9.  Paul Brandt, age 42 at plaintiff's
departure, is director of New England operations for Nicolock.
Id. at ¶¶ 67, 133.  Brandt was hired in November 2001 to manage
Nicolock New England and three other Nicolia Industries
companies. Id. at ¶ 67.  He and Nicolia met in college and have
been good friends since. Id. at ¶ 77.

A. Nicolock Personnel

Plaintiff joined Nicolock as a sales representative on the
recommendation of Picone, whom he had known for years from
previous business dealings. Id. at ¶ 14.  As a sales
representative, plaintiff serviced products at mason yards,
called on new accounts, maintained existing accounts, and worked
with the contractor trade, giving technical advice about the
product.  Id. at ¶ 5.  In addition to his work in sales, in 1999,

2

plaintiff was chosen to oversee the construction of the North Haven, Connecticut manufacturing plant which was completed in the fall of 2001. Id. at ¶ 22.  Plaintiff's starting annual salary was $52,000. Id. at ¶ 26.  On May 17, 1999, his pay was increased to $60,000 per year and on March 5, 2001, he received a pay increase to $75,000. Id.  After Brandt joined the company in November 2001, plaintiff was made Sales Director of New England. Id. at ¶ 49.  In 2002, Nicolock New England's sales department made $2.4 million, below its target of $4 million. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 93.  In 2003, after plaintiff's departure, Nicolock's New England's sales reached its target of $4 million. Id.

When plaintiff moved into the North Haven plant upon its completion in late 2001, he recommended that Ed Klemanski and Mike McQuiggan be brought on as sales representatives for the new facility. Id. at ¶ 50.  Both Klemanski and McQuiggan continued to work at Nicolock after Honeck was terminated.  Ed Klemanski was hired by Nicolock in 2001 at age 53. Id. at ¶ 51.  McQuiggan was hired by Nicolock New England as a sales representative in 2001 at age 50, left Nicolock in the fall of 2003 to pursue a "better opportunity" at Haynes Materials Co, and was then re-hired by Nicolock in 2004 at age 53. Id. at ¶¶ 57, 58.

Ed Wagner began working for Nicolock before the North Haven property was purchased.  He then worked as a site supervisor,

running the Nicolock yard for the North Haven plant.  On February 20, 2002, Wagner was terminated by Brandt, in plaintiff's presence.  At that meeting, according to Wagner, Brandt commented that Wagner was "too old for this job." Wagner Dep. 31:12-16, June 28, 2005, Ex. 7 to Pl.'s Mem. Opp. Summ. J. [Doc. # 46].

B. Honeck's Depression

Plaintiff was diagnosed with depression by Dr. Balf, a general practitioner, in August 2002, at which point he began taking Zoloft. Pl.'s Dep. 209:5-23, April 21, 2005, Ex. 9 to Pl.'s Mem. Opp. Summ. J., Ex. 1 to Def.'s Mem. Supp. Summ. J.  He believes his depression substantially impaired the way he thinks. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 146.  He claims his thinking is not as rational or as quick as it used to be. Id.  Plaintiff was most incapacitated by his depression from August to November 2002. Id. at ¶¶ 157, 158.  Plaintiff has never sought psychiatric help for his depressive disorder. Id. at ¶¶ 159, 162.

Plaintiff informed both Picone and Brandt that he was taking Zoloft. Id. at ¶¶ 165-67.  Nicolia, however, was never made aware of plaintiff's condition. Id. at ¶ 170.

According to plaintiff, his Zoloft medication was regularly referred to as "happy pills" at Nicolock, a term plaintiff used regularly himself.  Pl.'s Dep. 94:9-10.  When plaintiff informed Picone that he would be taking Zoloft, Picone responded, "Good luck, I hope it helps you." Pl.'s L.R. 56(a)(2) Stmt. at ¶ 167.

Brandt occasionally asked plaintiff about his condition. Id. at ¶ 168.  On two or three occasions, when plaintiff came into work in a bad mood, Brandt said, "What is the matter, Honeck, didn't you take your happy pills?" Id. at ¶ 169, Pl.'s Dep. at 94:14-24.

C. Honeck's Clients

In late 2001, defendant's client O&G complained to the newly hired Brandt about the way plaintiff handled things. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 96.  According to Klemanski, as a result of complaints about plaintiff, Picone changed O&G from an account handled exclusively by plaintiff to one handled by plaintiff, Klemanski and McQuiggan. Klemanski Dep. 75:15-76:12, June 28, 2005, Ex. 8 to Pl.'s Mem. Opp. Summ. J.  In the last quarter of 2002, Picone informed Nicolia that plaintiff was "bashing" Nicolock's products and certain O&G locations while visiting other O&G locations.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 106.  In late 2002, at a meeting intended as a reconciliation between Nicolock and O&G, Bob Rizzo, Vice President of O&G, complained again about plaintiff. Id. at ¶¶ 103, 104.

Connecticut Stone Supplies, Inc. ("Connecticut Stone") is a Nicolock client with an annual sales volume of $100,000. Brandt Dep. 51:21-22, June 28, 2005, Ex. 8 to Def.'s Mem. Supp. Summ. J. [Doc. # 40].  Around late November 2002, Nicolia was informed that plaintiff had told Lance Dellacroce, a sales associate for Connecticut Stone, that Nicolia and Picone were "idiots" and that

Nicolock's products were no good.  Pl.'s L.R. 56(a)(2) Stmt. at ¶
108.  At a meeting with Picone, Brandt and Nicolia in December
2002, Dellacroce confirmed that plaintiff had made unflattering
comments about Nicolock and its management.  Id. at ¶¶ 110, 111.

 After learning about plaintiff's comments to Connecticut
Stone, Nicolia and Picone agreed that Honeck should be
terminated.  Id. at ¶ 116.  According to Nicolia, although he
could sometimes overlook poor sales, he did not tolerate
disloyalty among his staff.  Id. at ¶ 112.  At a meeting in
January 2003, Picone asked plaintiff to submit a letter of
resignation.  Id. at ¶ 127.  At this meeting, Picone informed
plaintiff that he was being let go because of the incidents with
Connecticut Stone and O&G.  Id. at ¶ 128.

 After plaintiff's resignation, the position of Sales
Director for Nicolock New England was eliminated.  Id. at ¶ 180.
Picone absorbed plaintiff's managerial responsibilities.  Id. at ¶
181.  In February and April of 2003, respectively, younger
employees Ben Farina and Lee Jackson were hired as sales
representatives but neither of them was given managerial
responsibilities.  Id. at ¶¶ 181, 183; Nicolia Supp. Aff. at ¶ 20,
Ex. 4 to Def.'s Mem. Supp. Summ. J.

 D. Age-related Comments

 According to plaintiff, Nicolia had made reference on
several occasions to plaintiff's age, but Honeck was only able to

recall one instance.  In 2000, at a seminar in Massachusetts, Nicolia allegedly said to plaintiff and Picone, among other things, that "sometimes you got to babysit ... old men." Pl.'s L.R. 56(a)(2) Stmt. at ¶ 29.  Plaintiff also states that toward the end of his employment, he was made aware by Jerome Codger, a yard employee, that Brandt had made age-related comments about plaintiff behind his back.  According to plaintiff, Brandt commented to Codger that plaintiff was unable to "keep up with the younger people ... labor factor wise." Pl.'s Dep. 109:1-10.

## II. STANDARD

When deciding on a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995)(citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

"The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom

summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." <u>Id.</u> (citations omitted).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ... [and] it should be interpreted in a way that allows it to accomplish this purpose." <u>Ungerleider v. Fleet Mortgage Group of Fleet Bank</u>, 329 F. Supp. 2d 343, 353 (D. Conn. 2004)(<u>quoting Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)).  However, the Second Circuit "has cautioned district courts to be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997).

## III. DISCUSSION

A. <u>ADEA Claim</u>

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Under the <u>McDonnell Douglas</u> three-prong burden-shifting framework, a plaintiff in an ADEA case must first establish a

8

prima facie case of discrimination on account of age, by showing
that (1) he is a member of a protected class; (2) he is qualified
for his position; (3) he has suffered an adverse employment
action; and (4) he suffered this action under circumstances
giving rise to an inference of discrimination on the basis of
membership in the protected class.  See McDonnell Douglas Corp.
v. Green, 411 U.S. 792, 802 (1973).

Then the burden shifts to defendant "to produce evidence
that the plaintiff was [terminated] for a legitimate,
nondiscriminatory reason.  This burden is one of production, not
persuasion; it can involve no credibility assessment." Reeves v.
Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000).  If
defendant proffers evidence which "taken as true, would permit
the conclusion that there was a nondiscriminatory reason for the
adverse action," then he has satisfied his burden. St. Mary's
Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

Once the employer has proffered a neutral reason for the
termination, the burden shifts again to the plaintiff to show
pretext, i.e. to show that the "employer's proffered explanation
is unworthy of credence." Reeves, 530 U.S. at 143.  "[A]lthough
the presumption of discrimination drops out of the picture once
the defendant meets its burden of production,... the trier of
fact may still consider the evidence establishing the plaintiff's
prima facie case and inferences properly drawn therefrom ... on

the issue of whether the defendant's explanation is pretextual."
Id. (internal citations and quotations omitted).

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. ... [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability." Id. at 147-48.

Honeck has established his prima facie case: 1) he is a member of the protected class because he was nearly 60 at the time of termination[1]; 2) he was qualified to be Sales Director of Nicolock New England, having worked in sales there for nearly six years; 3) he was forced to resign his position;[2] and 4) plaintiff claims negative age-related comments by the company's owner, Nicolia, as evidence of age bias.  The burden thus shifts to the defendant to proffer non-discriminatory reasons for termination, which in summary are: poor sales performance, customer

---

[1]The protected class comprises people over the age of 40. 29 U.S.C. § 631(a).

[2]Picone told Honeck that "things were not working out and that [he and Nicolia] felt it was best for [Honeck] to resign." Picone Aff. at ¶ 15, June 2003, Ex. 2 to Def.'s Mem. Supp. Summ. J.

complaints, and an accusation of making negative comments about the company and its principals in the presence of a customer.

### 1. Defendant's proffered reasons for termination

Defendant provides testimony that Honeck's performance had begun to decline after the opening of the North Haven plant. Picone states that, up to the end of 2001, Nicolock was reasonably satisfied with plaintiff's performance "but had reservations about his management ability." Picone Aff. at ¶ 8. By the end of 2002, however, Picone had become "extremely dissatisfied with Mr. Honeck's performance as sales director," and "did not feel that the sales department was heading in the right direction." Id. at ¶ 10.

Defendant also offers evidence of plaintiff's poor sales performance in the form of sales volume. According to Nicolia and Brandt, the sales target for Nicolock New England for fiscal year 2002 (its first year of operation) was $4 million. Brandt Dep. 15:24-16:5, 17:16-18. During that year, Nicolock made only $2.4 million. Pl's L.R. 56(a)(2) at ¶ 93. Plaintiff also admits to the fact that sales in 2002 were not as high as they should have been. Pl.'s L.R. 56(a)(2) at ¶ 94. Sales in New England have experienced double-digit growth since plaintiff's separation from Nicolock. Id. at ¶ 95.

Defendant further offers testimony that O&G, Nicolock New England's largest customer, had made complaints in late 2001

11

about the way plaintiff was handling its account, and then again in late 2002, including complaints about deriding Nicolock products as well as certain O&G locations. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 96, 103, 104, 106.

However, according to defendant, the final straw was plaintiff's derogatory comments about Nicolock and its management to a sales associate at Connecticut Stone. Id. at ¶ 112.  These comments included, in Nicolia's recollection, that Picone and Nicolia were "idiots" and that Nicolock's product "sucks." Nicolia Dep. 30:11-17, Sept. 7, 2005, Ex. 3 to Def.'s Mem. Supp. Summ. J.  In Brandt's recollection, Dellacroce stated that plaintiff was "badmouthing upper management, company, product in a bad way and should not be around." Brandt Dep. 30:22-24.

2. Evidence of pretext

Honeck offers deposition testimony from Klemanski, a former sales representative at Nicolock, and Guarino, a principal of Nicolock client Old Broadway, in an attempt to refute defendant's claim of poor sales performance in 2002.  Both Klemanski and Guarino painted Honeck as knowledgeable and competent.  Klemanski testified that Honeck had an "extensive background in manufacturing of paving and concrete products." Klemanski Dep. 11:8-10.  Guarino testified that Honeck was reliable and competent at servicing the product; when Honeck was handling his account, problems were "solved instantly."  Guarino Dep. 14:2-6,

June 15, 2005, Ex. 6 to Pl.'s Mem. Opp. Summ. J.  Guarino's testimony also suggested that Honeck was a good salesman: Honeck's sales pitch of Nicolock products had been the motivation for Guarino's son to start Old Broadway. Id. at 7:6-11.

Klemanski further provides possible reasons why sales at Nicolock New England were low in 2002.  According to Klemanski, initially there were manufacturing problems with the North Haven plant and it is "very common for a new manufacturing facility to have to work out bugs.  It takes several years." Klemanski Dep. 12:2-4.  Klemanski also noted that a number of customer complaints resulted from these growing pains and some from issues with natural resources.  Other customer complaints actually resulted from problems with materials they were using from two Long Island Nicolock plants, including breakage and efflorescence. Id. at 12:14-25.

In addition, Klemanski stated that Nicolock New England had other issues as a start-up company: plaintiff had to deal with the Nicolia family and their "very specific ways about doing things," which included day to day changes in demands, and denial of things that were needed for marketing and sales. Id. at 17:23-25.

Thus, plaintiff presents evidence that he was a competent salesperson with sound qualifications.  Even though plaintiff does not contest the fact that sales were below expectation in

2002, he presents evidence that there were business cycle reasons why he did not meet the sales goal for 2002.  Plaintiff's evidence raises an issue of material fact as to whether his not meeting Nicolock's sales goals was a legitimate reason for discharge.

Plaintiff counters defendant's allegations that he was the cause of the problems with O&G with deposition testimony from Klemanski and Wagner, former site manager for the North Haven plant.  They both testified that O&G was a difficult customer, the complaints of which were often unfounded, or were related to product quality rather than service quality. Wagner Dep. 29:25-30:1-5, 47:1-10, 14-18; Klemanski Dep. 30:18-20, 31:2-13, 70:9-16.  According to Wagner, he believed O&G was "looking to switch companies," so they were "looking for ammunition and complaints." Wagner Dep. 47:14-18.  Klemanski further testified that as a result of complaints about the product and Honeck as O&G's sole sales representative, the O&G account was divided up between the entire sales staff. Klemanski Dep. 75:15-76:12.

Plaintiff's evidence supports the notion that problems with O&G as a client had begun at least a year before plaintiff's termination, and that many of O&G's complaints were unfounded. It also supports the idea that Picone was aware of these problems early, since he had already taken remedial action in the form of reassignment of duties.  Plaintiff's evidence therefore, raises

14

an issue of material fact as to whether Honeck's handling of the
O&G account constituted a real reason for discharge.

     If the Court were to have only these two reasons as
defendant's proffered reasons for plaintiff's termination,
genuine issues of material fact would require trial
determination.  However, defendant argues, and Nicolia's
testimony supports, that notwithstanding these disputed factors,
the immediate and direct reason for the decision to seek
plaintiff's resignation was the information about his disrespect
for and disloyalty to the company, its products and its
management. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 112.

     An employer's good-faith belief that an employee has
committed misconduct provides the employer with a
nondiscriminatory reason for termination, whether or not the
misconduct occurred. See Roge v. NYP Holdings, Inc., 257 F.3d
164, 169 (2d Cir. 2001)("[A]t the time of [the employee]'s
termination, the [employer] believed, as a result of [the
employee]'s own actions, that [the employee] had committed
disability fraud.").  Furthermore, evidence which disputes the
truth of the misconduct report does not prove pretext, since "the
report alone is a legitimate non-discriminatory reason for
discharge." Brown v. Brown & Williamson Tobacco Corp., No. 95-
30281-LAC, 1996 WL 325890, at *4 (N.D. Fla. Apr. 11,
1996)(emphasis in original).

Plaintiff does not deny that he made derogatory comments about Nicolock and its principals. Pl.'s L.R. 56(a)(2) at ¶ 110. He also admits that in the fall of 2002, he was avoiding customers and potential customers and saying things he should not have been saying. <u>Id.</u> at ¶ 98.  Furthermore, plaintiff considers such behavior especially inappropriate for sales representatives, because it was bad sales technique: "you don't capture customers by badmouthing the company you work for." <u>Id.</u> at ¶ 138; Pl.'s Dep. 139:1-24.  Plaintiff provides no evidence to dispute that defendant had a good faith belief that he had made these comments to a big client, nor that Connecticut Stone's accusations were not the reason for defendant's decision to terminate him. Plaintiff does not dispute that these negative comments upset Nicolia–-that Nicolia can sometimes overlook poor performance or sales, but he cannot tolerate staff disloyalty.  <u>Id.</u> at ¶ 112. He further does not dispute that Nicolia knew of no other such comments by other staff.  <u>Id.</u> at ¶ 113.

Even if there is dispute about the customer relations and slumping sales context, no reasonable trier of fact could conclude that defendant's decision to terminate Honeck because of an undisputed report of disloyalty was not a legitimate, non-discriminatory reason for Honeck's discharge.

### 3. <u>Age-related Comments</u>

Even if a plaintiff fails to have evidence of pretext, a

plaintiff may use other evidence to show that discriminatory animus played a role in his termination.  "To defeat summary judgment within the <u>McDonnell Douglas</u> framework ... the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." <u>Back v. Hastings on Hudson Union Free School Dist.</u>, 365 F. 3d 107, 123 (2d Cir. 2004)(<u>citing</u> <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 78 (2d Cir. 2001)(internal quotations omitted)).

Plaintiff argues that the alleged age-related comments directed at him and Wagner are evidence of discrimination.  Pl.'s Mot. Opp. Summ. J. at 14.  "In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is ... non-probative ..., a court should consider the following factors: (1) who made the remark, <u>i.e.</u> a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, <u>i.e.</u> whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, <u>i.e.</u> whether it was related to the decisionmaking process." <u>Schreiber v. Worldco, LLC</u>, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004)(citations omitted).

The record contains three references to age-related

comments: comments made by Brandt to Wagner in plaintiff's
presence in February 2002; comments made by Brandt behind
plaintiff's back to Codger, a yard employee; and comments made by
Nicolia to Picone and plaintiff in about 2000.

At oral argument, plaintiff relied heavily on the comment
made in his presence by Brandt to Wagner on the day of Wagner's
termination, in February 2002, that Wagner was "too old for this
job." Wagner Dep. 31:12-16.  Brandt denies having made this
comment. Brandt Dep. 48:11-17.  Also, according to Wagner, Brandt
was intimidated "by anybody at Nicolock who had already had
experience in the paving stone industry." Wagner Dep. 28:15-25.

This remark, viewed in a light most favorable to the
plaintiff, could be probative of an age bias harbored by Brandt,
even though it is remote to plaintiff's termination (one year)
and was not directed toward plaintiff.  The critical and
undisputed fact is that Brandt was not involved in plaintiff's
termination decision.  See Ungerleider v. Fleet Mortgage Group of
Fleet Bank, 329 F. Supp. 2d 343, 359 (D. Conn. 2004)(citing Siino
v. N.Y. City Bd. of Educ., No. 99-9327, 2000 WL 528651, at *1 (2d
Cir. May 1, 2000)("even if [an official] did make the alleged
statements, they do not give rise to an inference of
discrimination because she did not make hiring decision")).
Plaintiff admits that Brandt was not a decision-maker and that
plaintiff's termination decision was made by Picone and Nicolia,

independently from Brandt. Pl.'s L.R. 56(a)(2) at ¶¶ 118 & 119.
He also admits that Brandt never made any age-related comments
directly to him.  Id. at ¶ 48.

Plaintiff nonetheless argues that Brandt's comment is
probative as a manifestation of a corporate culture of
discrimination. Pl.'s Mem. Opp. Summ. J. at 15.  Plaintiff relies
on Cline v. Roadway Express, Inc., 689 F.2d 481, 486-87 (4th Cir.
1982), where the court found that the plaintiff's termination was
the result of a corporate policy of upgrading older employees
with younger employees.  In Cline, the employer, through its vice
president, implemented a new policy where employees who had not
been promoted in five years would be replaced with "higher
quality employees, preferably college graduates."  Id. at 486.
The Fourth Circuit upheld the district court's finding that since
some managers interpreted the policy as requiring the "discharge
of older men and [hiring of] younger college graduates in their
place," that the employee was discharged because of his age. Id.
at 487.

No such corporate culture of age discrimination can be
inferred to exist here from Brandt's comments.  Plaintiff has
provided no evidence of any age discriminatory policy of any
sort, or that Brandt had interpreted any Nicolock policy as
disfavoring older employees.  Plaintiff also has not provided any
evidence that Brandt's alleged age animus tainted either Picone

or Nicolia, other than the fact that Brandt and Nicolia were friends.  Finally, even though plaintiff argues that Brandt was carrying out a corporate policy of age discrimination, testimony from plaintiff's witness Wagner suggests that Brandt had his own agenda.

The other age-related comment allegedly made by Brandt about plaintiff to Codger, a yard employee, who in turn informed plaintiff about it, Pl.'s Dep. 109:11-15, is inadmissible hearsay and cannot be considered as evidence under Rule 56, absent an affidavit from Codger or other competent evidence.  Moreover, since plaintiff acknowledges that Brandt did not play a role in his termination decision, even if the comment were admissible, it would not be probative of any discriminatory animus on the part of the defendant employer.

Finally, the age-related comment made by Nicolia to plaintiff and Picone after a business seminar in Massachusetts in about 2000, when Nicolia, Picone and plaintiff "were talking about different things and every once in a while [plaintiff and Picone] would get a remark about [their] age," Pl.'s Dep. 74:6-9, is insufficient to create a triable issue of fact.  Plaintiff is only able to recall one comment specifically, that "sometimes you got to babysit ... old men," which was aimed at both plaintiff and Picone, in response to which plaintiff told Nicolia that "age was proof of experience," Pl.'s L.R. 56(a)(2) at ¶ 29.

Even though the comments were made by Nicolia, defendant's chief decisionmaker, any inference of bias to be inferred is too weak to support a jury verdict in plaintiff's favor.  First, over two years had passed from the time of the remark in 2000 to the termination decision in December 2002.  Second, the comment was directed at both plaintiff and Picone, who is four years older than plaintiff, and, as far as the record shows, has suffered no adverse employment actions.  Pl.'s L.R. 56(a)(2) at ¶ 37.  Third, around the time of the remark, plaintiff received a substantial salary increase of 25 percent.

Nicolia's comment further needs to be viewed in light of all of the evidence presented by plaintiff.  In the context of plaintiff's admitted declining performance and problems with clients, and from the gravity of the undisputed report of plaintiff's disloyalty, this age-related comment made two years earlier is simply insufficient to allow any reasonable jury to infer that Nicolock's decision to terminate Honeck was motivated by discriminatory animus.

The Court finds, therefore, that plaintiff has failed to come forward with sufficient evidence for a jury to conclude that defendant's proffered reason for termination--disloyalty--was pretextual or that plaintiff's age was also a factor in the decision to terminate his employment.

B. <u>ADA claim</u>

Defendant argues that plaintiff has failed to make a prima facie case of disability discrimination for two reasons: 1)plaintiff's depressive disorder does not make him a member of the protected class, and 2) no link exists between plaintiff's disability and the company's request for resignation.

Under the ADA, an employer is prohibited from discriminating against a "qualified individual with a disability because of the disability of such individual in regard to ... [the] discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "To make out a prima facie case under the ADA, a plaintiff must establish that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of N.Y., 274 F.3d 740, 748 (2d Cir. 2001)(quoting Heyman v. Queens Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999)).

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Plaintiff alleges that he is disabled because he has been

22

"diagnosed" with depression, a mental impairment. Pl.'s Dep. 209:5-23.  EEOC regulations define a mental impairment as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h).  Assuming that plaintiff's depressive disorder, although never differentiated by a mental health professional beyond this generalization, is a mental disorder within the meaning of EEOC regulations, plaintiff has not shown that his depression limited any major life activity.

"Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. at § 1630.2(i). Plaintiff stated at oral argument that his ability to think has been impaired by his depression. See also Pl.'s Dep. 203-10. However, "'[t]hinking' has not been recognized as a separate major life activity" by the EEOC. See Pare v. City of Bristol, 386 F. Supp. 2d 43, 52 (D. Conn. 2005).  Plaintiff has not argued that difficulties with thinking substantially limited the more specific life activities identified by the EEOC such as working or learning.

Additionally, plaintiff's argument that his depression interfered with his ability to cold-call clients or treat clients civilly contradicts his previous arguments that he believed he

was performing well and meeting expectations. <u>See</u> Pl.'s Mem. Opp. Summ. J. at 17; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 172.  Furthermore, plaintiff argues that his depression caused him problems between August and November 2002, but the record evidence indicates that plaintiff was, in fact, having problems with O&G as early as December 2001, and his sales volume for all of 2002 was a little over half of the target. Pl.'s Dep. 266:6-16; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 93, 96.

Plaintiff has not demonstrated that he was substantially limited in any major life activity, and, thus, has failed to establish that he is a member of the protected class under the ADA.  Since plaintiff has failed to satisfy the first element of the prima facie case, the Court need not consider defendant's second causation ground.  Defendant is therefore entitled to summary judgment on this count.

**IV. CONCLUSION**

Accordingly, defendant's Motion for Summary Judgment on plaintiff's ADA and ADEA claims [Doc. # 39] is GRANTED and this case will be closed.

IT IS SO ORDERED

/s/_____
_____JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 25th day of August, 2006.**